RENDERED: JUNE 21, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0511-MR

HATEM KAISI                                                          APPELLANT

v.
APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ERIC JOSEPH HANER, JUDGE
ACTION NO. 21-CI-006975

JOHN ISAACS, SR. AND JOHN
ISAACS AND ASSOCIATES, LLC                                          APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, EASTON, AND GOODWINE, JUDGES.

EASTON, JUDGE: The Appellant ("Kaisi") asks us to reverse the Order of the

Jefferson Circuit Court dismissing his Complaint against the Appellees ("Isaacs")

in this case alleging malpractice by accountants. Because Kaisi's claims are barred

by collateral estoppel and public policy, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Kaisi was in the business of selling cars. Isaacs provided accounting

services and prepared Kaisi's tax returns. Kaisi refers to what he calls a "family

ownership scheme" supposedly created by Isaacs for Kaisi through which income could be diverted to Kaisi's family members, thus avoiding taxes. Kaisi created limited liability companies as part of this scheme. Because of improperly unreported income, Kaisi was indicted not only for tax evasion, but also for falsely claiming low-income eligibility for Medicaid medical coverage.

In a plea agreement with the federal government, Kaisi pled guilty to his charges "because he is in fact guilty of the charges" according to the plea agreement. Kaisi agreed to the factual basis for the charges, which included his personal mental state of having "willfully" participated in tax evasion. Kaisi could have been sentenced to up to 19 years in prison but instead received a sentence of one year. He also had to pay several hundred thousand dollars back to the federal government.

Kaisi does not shy away from his criminal conviction. He pleads it in his Complaint and seeks to recover from Isaacs for breach of contract, negligence, emotional distress, and loss of reputation, all of which he blames on Isaacs for supposedly advising him into the tax evasion. The circuit court dismissed the Complaint for failure to state a claim upon which relief may be granted. This appeal follows.

## STANDARD OF REVIEW

The parties agree on the standard of review. The decision to be reviewed is a dismissal under CR[1] 12.02. The circuit court did not consider any material outside of the pleadings, making it clear that the decision was not based on evidentiary materials submitted. Kaisi's criminal conviction was pled by him and not denied in any answer. This is not a situation of a dismissal motion becoming a summary judgment because of the consideration of evidentiary materials outside of the pleadings. On a motion to dismiss, the circuit court and this Court must accept as true the facts alleged in the Complaint. Only a legal question is presented. We review the decision of the circuit court de novo. *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010).

## ANALYSIS

Because this case involves a dismissal rather than summary judgment, we need not delve into any factual disputes about what Isaacs did. For example, Isaacs does not deny doing certain work for Kaisi, but Isaacs insists Kaisi did not follow advice on making required distributions of income. Still, we must assume

---

[1] Kentucky Rules of Civil Procedure.

all Kaisi's allegations are true, and that Isaacs committed malpractice[2] in the services provided to Kaisi.

The question then becomes whether Kaisi may sue his accountant after he has pled guilty to crimes arising from the same transactions. This question requires us to evaluate two issues – collateral estoppel and public policy.

The leading Kentucky case for both these issues is *Ray v. Stone*, 952 S.W.2d 220 (Ky. App. 1997). *Ray* is factually distinguishable because it addressed attorney malpractice rather than accountant malpractice. Yet the general principle of collateral estoppel applies equally. In *Ray*, a client sued his attorney after the client was convicted of crimes. The client claimed the attorney was liable for damages the client suffered from the conviction because of how the attorney handled the case.

This Court in *Ray* held collateral estoppel barred the claims. *Id.* at 224. Collateral estoppel in these circumstances results from issue preclusion, a specific application of *res judicata*. We have recognized "the essential elements courts must evaluate when undergoing a collateral estoppel analysis: (1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with

---

[2] All the claims Kaisi has asserted fit to some extent under the umbrella of professional negligence regardless of what they are called in the Complaint. *See Lawrence v. Bingham, Greenebaum, Doll, L.L.P.*, 567 S.W.3d 133, 141 (Ky. 2018). As we will explain later, public policy precludes Kaisi's claims regardless of how they are denominated.

the estopped party given a full and fair opportunity to litigate; and (4) a prior losing litigant." *Estate of Reeder v. Ashland Police Department*, 588 S.W.3d 160, 166 (Ky. App. 2019).

These elements are met when we evaluate the issue of whether Kaisi himself is guilty of crimes for his willful conduct. Kaisi was the prior losing litigant in the criminal case. The judgment entered on Kaisi's guilty plea was final. He had the required opportunity to litigate the issues, although Kaisi chose to forego a trial with his guilty plea. The common issue in the criminal case and in this subsequent civil case is Kaisi's criminal intent to willfully violate the law. With preclusion of relitigating that issue, the question then becomes whether Kaisi may still blame his accountant and recover damages.

The distinction between attorney malpractice and accountant malpractice should be considered in this analysis. In the context of blaming the attorney for a criminal conviction, there is more of a nexus with the criminal conviction than with an accountant providing services which happen to lead to a criminal conviction. Clients often blame trial attorneys especially for actions or inactions in the proceedings which directly led to convictions. In that context, *Ray* established a rule requiring exoneration before the attorney could be sued. If the client was in fact guilty of a crime as established by a judgment, then no action may be taken against an attorney involved in the criminal case, until the conviction

-5-

was set aside, which may be accomplished through a finding of ineffective representation by counsel in post-conviction proceedings in the criminal case. *Ray*, *supra*, at 225.

The Kentucky Supreme Court has recognized this Exoneration Rule based on *Ray*. *Lawrence v. Bingham, Greenebaum, Doll, L.L.P.*, 567 S.W.3d 133, 140 (Ky. 2018).[3] But we have no published[4] authority in Kentucky which addresses how collateral estoppel from a criminal conviction might apply to an accountant malpractice claim. As we will see, several other states have been called upon to decide this question and lead us to the conclusion that Kaisi cannot maintain this case against Isaacs.

In *Ray*, we borrowed from the experience of Texas courts.[5] Texas courts have twice evaluated collateral estoppel for accountant malpractice claims.

---

[3] Despite criticism of the rule in other states, we must follow our Supreme Court's position regarding the Exoneration Rule, including the fairly recent *Lawrence* decision. It is a rule usually referenced only in the context of attorney malpractice. We need not "extend" it in this case. We simply recognize that the principles of collateral estoppel and public policy which uphold the Exoneration Rule also uphold the ruling in this case, although we respect the concurrence's concerns about collateral estoppel as applied here. In any event, we all agree that Kaisi's claims are barred.

[4] We are aware of *Lawrence v. Ryan*, Nos. 2016-CA-000103-MR and 2016-CA-000440-MR, 2017 WL 1806768 (Ky. App. May 5, 2017). This case involved the same plaintiff as the *Lawrence* case to which we have just referred. In this unpublished case, this Court held an accountant could not be sued by a client who pled guilty to criminal charges supposedly resulting from the accountant's advice. In doing so, this Court relied on *Ray*, *supra*, and did not discuss the unclean hands doctrine.

[5] *Ray* includes a citation to *Peeler v. Hughes*, 868 S.W.2d 823 (Tex. Ct. App. 1993), *aff'd*, 909 S.W.2d 494 (Tex. 1995).

The first case is *Dover v. Baker, Brown, Sharman & Parker*, 859 S.W.2d 441 (Tex. Ct. App. 1993). Dover, like Kaisi here, pled guilty to willful tax evasion. To be found guilty of such a charge necessarily means that the client did not rely in good faith on the advice of his tax professionals, because that is a defense to such a charge. *Id*. at 448. Even when this defense is not affirmatively asserted and thus not actually adjudicated, the admitted willful criminal intent remains for issue preclusion. Issue preclusion then works to support collateral estoppel for the accountant malpractice claim similar to its application to attorney malpractice.[6]

With the fact of such a criminal conviction, we then must look at public policy. Like the attorney situation, public policy prohibits the claims against the accountants by the criminally convicted client. The established individual guilt of the client cannot be overcome as the actual cause of the damages claimed. *Id*. at 451. *See also Andrew Shebay and Co., P.L.L.C. v. Bishop*, 429 S.W.3d 644 (Tex. Ct. App. 2013).

Other states in similar circumstances have agreed that collateral estoppel and public policy bar the claims against the accountants. *See Worman v. Carver*, 44 P.3d 82 (Wyo. 2002); *Columbia Medical Group, Inc. v. Herring &*

---

[6] We do not disagree with the thoughtful concurring opinion in its analysis of the "unclean hands" doctrine with respect to any equitable claim. The doctrine was not argued by the parties, but it is permissible for this Court to consider it. While the word "disgorgement" is not used in the Complaint, the claim for return of fees paid is clearly stated as one of the damages sought. But this equitable doctrine can take us only so far. It applies only to equitable claims, which are only part of what Kaisi asserts.

*Roll*, P.C., 829 A.2d 1184 (Pa. Super. 2003). The criminal acts of the client "were the substantial factor in bringing about the damages" the client suffered. *Id.* at 1190.

Only a badly divided Georgia appellate court has allowed such a claim. *Consolidated Management Services, Inc. v. Halligan*, 368 S.E.2d 148 (Ga. App. 1988). The Georgia court allowed the claim because of an evidentiary rule forbidding the use of a criminal conviction in a subsequent civil suit. *Id.* at 150. The ruling was based on *Pierce v. Pierce*, 243 S.E.2d 46 (Ga. 1978) (evidence of husband's acquittal of sexual abuse charges could not be introduced in divorce proceedings).

The continued validity of *Pierce* is suspect. The underlying evidentiary rule applied in *Halligan* was later distinguished to permit evidence of a guilty plea in a subsequent civil case. *Trustgard Ins. Co. v. Herndon*, 790 S.E.2d 115, 118 n.3 (Ga. App. 2016). This older evidentiary rule is also inconsistent with more specific modern rules allowing such evidence as seen for example in RESTATEMENT (SECOND) OF JUDGMENTS § 85(2)(a).

Regardless of the continued validity of *Halligan* in Georgia, its reasoning is specifically contrary to Kentucky law. We permit the use of a criminal conviction as evidence in a subsequent civil case. *Gossage v. Roberts*, 904 S.W.2d 246, 249 (Ky. App. 1995). We also allow such evidence as a hearsay

exception under KRE[7] 802(22).  Georgia now has its own version of KRE 802(22), which became effective in 2013 as part of a comprehensive new evidence code.

Ultimately, we return to *Ray*.  Our public policy does not allow anyone to obtain damages when their own criminal conduct is a cause of those damages.  *Ray*, *supra*, at 224.  The cases from other jurisdictions which have barred such claims against accountants have similarly expressed this public policy.

Kaisi cannot maintain a suit against his accountant because Kaisi's own criminal actions played a substantial part in the damages he claims.  This must include not only claims relating to imprisonment and financial penalties Kaisi incurred but also the other costs of Kaisi's willful participation in the "scheme." Characterizing the claims as loss of reputation, emotional distress, or other claims does not somehow remove them from the public policy prohibiting the criminally convicted client from recovering from his accountants.  *See Worman*, *supra*, at 85.

CONCLUSION

Because Kaisi was adjudicated guilty upon his guilty plea to willful participation in his crimes relating to tax evasion, he is collaterally estopped from claiming he is not responsible for his own actions.  With this level of personal responsibility, public policy prevents Kaisi from making claims against the

---

[7] Kentucky Rules of Evidence.

accountants who provided services to him which may have led him to his criminal acts. The Jefferson Circuit Court is AFFIRMED.

GOODWINE, JUDGE, CONCURS.

ACREE, JUDGE, CONCURS IN RESULT ONLY AND FILES A SEPARATE OPINION.

ACREE, JUDGE, CONCURRING IN RESULT ONLY: Like the majority, I conclude that affirming the trial court is the correct result. However, I believe the circuit court's rationale is legally erroneous. Therefore, I respectfully disagree with the majority opinion's analysis that affirms on that same basis. I would affirm on different grounds, by applying the doctrine of unclean hands. *Kentucky Farm Bur. Mut. Ins. Co. v. Gray*, 814 S.W.2d 928, 930 (Ky. App. 1991) (Court of Appeals, "as an appellate court, may affirm the trial court for any reason sustainable by the record.").[8]

---

[8] In addition to the other reasons set out in these opinions, this Court would be justified in affirming the trial court based on Kaisi's counsel's violations of the Kentucky Rules of Appellate Procedure (RAP). RAP 10; *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021) (argument failing to inform appellate court how issue was preserved and where to find it in record can be treated as unpreserved and argument stricken from brief unless party seeks palpable error review). Besides violating RAP 32(A)(3) and (4) by failing to provide a preservation statement and failing to cite to the record, the brief does not include a statement of points and authorities setting out Kaisi's "contentions with respect to each issue of law relied upon for a reversal, listing under each the authorities cited on that point and the respective pages of the brief on which the argument appears and on which the authorities are cited." RAP 32(A)(2). The section titled "Statement of the Case" does not "consist[] of a summary of the facts and procedural events relevant and necessary to an understanding of the issues presented . . . ." RAP 32(A)(3). The brief also fails to comply with the following rules: RAP 31(A)(1)(e); RAP 32(E)(1)(a), RAP; 32(E)(1)(d).

*Applying unclean hands doctrine resolves Kaisi's claim in Isaacs's favor*

As now Justice Thompson said in an opinion he authored as a Judge of this Court of Appeals:

> The unclean hands doctrine is a rule of equity that forecloses relief to a party who has engaged in fraudulent, illegal, or unconscionable conduct but does not operate so as to "repel all sinners from courts of equity." *Dunscombe v. Amfot Oil Co.*, 201 Ky. 290, 256 S.W. 427, 429 (1923). "The transaction with respect to which there was misconduct must be connected with the matter in litigation in order for the doctrine of unclean hands to apply." *Eline Realty Co. v. Foeman*, 252 S.W.2d 15, 19 (Ky. 1952).

*Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. App. 2007). And so it is in this case.

The remedy Kaisi seeks is the disgorgement of the professional fees he paid Isaacs. Disgorgement is an equitable remedy. *Bracken v. Johnson*, 249 S.W.2d 149, 153 (Ky. 1952). To the extent Kaisi claims other damages for emotional distress and loss of sales and reputation, the equitable doctrine of unclean hands will still apply because doing so is not "in direct conflict with settled legislatively enacted rules of practice approved and followed by courts of equity from an ancient day to the present time." *Vittitow v. Keene*, 95 S.W.2d 1083, 1084 (Ky. 1936).

Kaisi's conduct perfectly suits the doctrine's application here. He pleaded guilty to the federal felony of filing false tax returns and understating income. (Complaint ¶ 6.) That is, he "willfully ma[de] and subscrib[ed a federal

tax] return . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, *and which he does not believe to be true and correct as to every material matter . . . ."* 26 U.S.C.[9] § 7206(1) (captioned Fraud and False Statements) (emphasis added). The *mens rea* element indicated by this federal statute required Kaisi to acknowledge that even if Isaacs's professional advice and tax planning was to blame, Kaisi knew that before signing returns understating his income and knowingly making statements subject to penalties for perjury.

Of course, Kaisi's allegations of Isaacs's own wrongdoing are deemed true for purposes of reviewing the CR[10] 12.02 dismissal. But Isaacs's presumed wrongdoing changes nothing. "[T]he equitable maxim that 'he who comes into equity must come with clean hands' . . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant*." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S. Ct. 993, 997, 89 L. Ed. 1381 (1945) (emphasis added).

---

[9] United States Code.

[10] Kentucky Rules of Civil Procedure.

The prohibition against suing with unclean hands "does not demand that its suitors[11] shall have led blameless lives, . . . [but] it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814-15, 65 S. Ct. at 997 (internal quotation marks and citations omitted). The doctrine of unclean hands "necessarily gives wide range" to a court's "use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Id.* at 815, 65 S. Ct. at 997 (internal quotation marks and citation omitted). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim . . . ." *Id.* at 815, 65 S. Ct. at 997-98 (internal quotation marks and citations omitted).

So, while the misconduct of the party against whom the doctrine is applied "need not necessarily have been of such a nature as to be punishable as a crime[,]" *id.* at 815, 65 S. Ct. at 997, a court is on sound footing when applying the doctrine to dismiss an action by a plaintiff convicted of a felony "connected with the matter in litigation[.]" *Suter*, 226 S.W.3d at 843 (internal quotation marks and

---

[11] The term "suitor" has fallen out of favor in this context but is synonymous with "plaintiff" or "petitioner." *Suitor*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("suitor (16c) 1. A party that brings a lawsuit; a plaintiff or petitioner. . . .").

citation omitted).  The facts presumed as true in Kaisi's complaint are tailor-made

for application of the unclean hands doctrine.  I would affirm on that basis.

*Circuit court's order is the product of legal error*

More importantly, the circuit court reached the right result by

committing legal error.  As explained below, collaterally estopping Kaisi's claim

cannot be accomplished by issue preclusion.  And, to the extent the circuit court

relies on public policy that manifests as the Exoneration Rule, it exceeds that rule's

scope and purpose, which is only to temper claims of criminal malpractice.

The term "criminal malpractice" has been used only to describe a

legal malpractice action brought by a former criminal defendant against his or her

former criminal defense attorney.  *See, e.g.*, Otto M. Kaus & Ronald E. Mallen,

*The Misguiding Hand of Counsel – Reflections on "Criminal Malpractice*,*"* 21

U.C.L.A. L. Rev. 1191, 1191 n.2 (1974) (defining the phrase).  The Kentucky

Supreme Court used the term in this context in *United States, ex rel. United States*

*Attorneys ex rel. Eastern, Western Districts of Kentucky v. Kentucky Bar*

*Association*, 439 S.W.3d 136, 156 n.90 (Ky. 2014).  The Kaus & Mallen article

also gave birth to "[t]he idea that a former client must obtain postconviction relief

before bringing a malpractice suit against his or her criminal defense attorney[.]"

*Rantz v. Kaufman*, 109 P.3d 132, 135 (Colo. 2005) (citing Kaus & Mallen, *supra*).

-14-

As discussed below, issue preclusion cannot bar Kaisi's claim against Isaacs because not all the doctrine's elements are satisfied. However, collateral estoppel of another sort will bar Kaisi's tort claim against his accountants if this Court sanctions expansion of the Exoneration Rule. I believe that is ill-advised.

The Exoneration Rule requires that a convicted felon "must accept as the sole, proximate, and producing cause of the indictment, conviction, and resultant incarceration, his own unlawful conduct." *Ray*, 952 S.W.2d 224. As I also discuss below, we should not make the mistake of expanding the Exoneration Rule by adopting the circuit court's errant analysis. Public policy considerations not only fail to justify, but weigh against, applying that rule of law to anyone other than the convicted felon's former defense counsel.

*Issue preclusion cannot apply in this case*

Consider first the inapplicability of issue preclusion to resolve this case. One of the elements of issue preclusion, the fifth element, is that "the decision on the issue in the prior action must have been *necessary* to the court's judgment and *adverse to the party to be bound*." *Miller v. Admin. Off. of the Cts.*, 361 S.W.3d 867, 872 (Ky. 2011) (emphasis added) (internal quotation marks and citations omitted). There are thus two parts of this fifth element: (1) resolving the issue was necessary to the prior adjudication, and (2) the prior tribunal decided the issue adversely to the party to be bound, in this case Kaisi. Neither is so here.

-15-

Isaacs cannot claim that when the federal court adjudicated Kaisi's guilt, it was necessary to resolve the issue of Isaacs's innocence. Plea Agreement, *United States v. Hatem Kasi*,[12] No. 3:18-CR-215-GNS (W.D. Ky. Jan. 14, 2021).

In fact, taking Kaisi's allegations of Isaacs's wrongdoing as true, the Internal Revenue Service could justly charge Isaacs with violating the same statute Kaisi violated, 26 U.S.C. § 7206. Kaisi violated subsection (1), but subsection (2) authorizes prosecuting "[a]ny person who . . . [w]illfully *aids or assists in*, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter . . . ." 26 U.S.C. § 7206(2) (emphasis added). Furthermore, Isaacs can be prosecuted under this statute "*whether or not such falsity or fraud is with the knowledge or consent of*" Kaisi. *Id.* (emphasis added).[13]

Because the federal court's adjudication of Kaisi's guilt did not require deciding whether Isaacs engaged in wrongdoing, the first part of the fifth

---

[12] The caption of the plea agreement spells the appellant's name Kasi.

[13] Again, presuming Kaisi's allegations are true, Isaacs might also have violated 26 U.S.C. § 6694, entitled "Understatement of taxpayer's liability by tax return preparer." This statute penalizes a tax return preparer who "prepares any return or claim of refund with respect to which any part of an understatement of liability is due to a[n] . . . [u]nreasonable position." In general, the statute is enforceable against a tax preparer who understates a taxpayer's income based on "a position for which there was not a realistic possibility of being sustained on its merits . . . ." *United States v. Pugh*, 717 F. Supp. 2d 271, 288 (E.D.N.Y. 2010).

element of issue preclusion is not satisfied. Similarly, because it was not necessary to adjudicate whether Isaacs engaged in wrongdoing, it wasn't decided adversely to Kaisi. In fact, it wasn't decided at all. Therefore, not only is the second part of the fifth element (a decision on the issue adverse to Kaisi) unmet, neither are the third and fourth elements: "(3) the issue must have been actually litigated; (4) the issue was actually decided in that action . . . ." *Miller*, 361 S.W.3d at 872 (internal quotation marks and citations omitted).

Issue preclusion, as a doctrine to collaterally estop Kaisi's claim, simply cannot apply in this case.

### *Supreme Court limited Exoneration Rule to barring criminal malpractice*

While issue preclusion cannot collaterally estop Kaisi's claim, expanding the Exoneration Rule can. However, expanding the Exoneration Rule beyond barring criminal malpractice claims is both unnecessary and ill-advised. It is unnecessary because, as addressed above, Kentucky's long-established and well-developed unclean hands doctrine neatly resolves the question. *Asher v. Asher*, 129 S.W.2d 552, 553 (Ky. 1939) ("In a long and unbroken line of cases this court has refused relief to one, who has created by his fraudulent acts the situation from which he asks to be extricated."). But besides being unnecessary, expanding the Exoneration Rule is unwise and imprudent for two reasons.

-17-

Primarily and most directly, the Supreme Court placed strict limits on the rule in *Lawrence v. Bingham, Greenebaum, Doll, L.L.P.*, 567 S.W.3d 133 (Ky. 2018). The Court's unanimous decision expressed Kentucky's version of the rule in carefully chosen words when it said:

> we adopt the following articulation of the Exoneration Rule: to survive a motion to dismiss for failure to state a claim *in a professional malpractice case against a criminal defense attorney*, the convicted client must plead in his complaint that he has been exonerated of the underlying criminal conviction. He or she need not prove actual innocence, but they also may not rely solely upon a claim of actual innocence in the absence of an exonerating court decision through appeal or post-conviction order. Further, the statute of limitations on the legal malpractice claim does not begin to run until the post-conviction exoneration occurs.

*Id.* at 141 (emphasis added). The Court clearly limited application of the rule to "professional malpractice case[s] against a criminal defense attorney[.]" *Id.* In crafting that very specific rule, the Court considered "the arguments presented . . . , the public policy considerations . . . , the rationale for the rule, the acceptance of the rule among the majority of states, and its application in Kentucky by the Court of Appeals for over twenty years[.]" *Id.* at 140.

This leads to the secondary reason for not expanding the rule – the controversy surrounding its limited application even when restricted to barring criminal malpractice claims.

_Adopting and applying the Exoneration Rule is universally discomforting_

When this Court adopted the Exoneration Rule in _Ray v. Stone_, we did little more than parrot "the influential Texas case, _Peeler v. Hughes & Luce_, 868 S.W.2d 823, 832 (Tex. Ct. App. 1993) [(hereinafter _Peeler I_).]" _Lawrence_, 567 S.W.3d at 138.  By the time the issue was before our Supreme Court two decades later, there were "eleven approaches for a standard of criminal malpractice claims adopted by different states" and our Justices had to decide which best suited Kentucky.  _See_ Nicholas Van Cleve, _Amending the Peeler Doctrine:  How to Provide Convicted Plaintiffs an Equitable Opportunity to Pursue Legal Malpractice Claims_, 56 HOUS. L. REV. 927, 938-43 (2019) (listing the eleven (11) versions and categorizing each state).

_Ray v. Stone_ put Kentucky in the fourth of those eleven (11) categories – "Actual innocence" – a category "requir[ing] the plaintiff to prove by a preponderance of the evidence that he or she was innocent of the crime charged." _Id._ at 940 (footnotes omitted).  _Lawrence v. Bingham_ removed the requirement of proving actual innocence, shifting Kentucky into the sixth category on that list – "Legal innocence or exoneration" – a category "requir[ing] that convicts establish legal innocence via proof of exoneration or other post-conviction relief before suing their criminal defense attorneys for malpractice." _Id._ at 940-41.

The panel of this Court that decided *Ray v. Stone* could not know then the controversy that would erupt around the rule we adopted from *Peeler v. Hughes & Luce* – what became known as the *Peeler* Doctrine in Texas and the Exoneration Rule elsewhere. Fortunately, after twenty-five (25) years of national commentary about the Texas doctrine and more generally about the Exoneration Rule, our Supreme Court had far more authority to reference. *Lawrence*, 567 S.W.3d at 140 (noting, for example, that "several jurisdictions have not adopted the Exoneration Rule but have criticized or rejected the rule." (citing opinions from the jurisdictions of Alabama, Indiana, Michigan, New Mexico, and Ohio)).

It is helpful to know the facts upon which the Texas *Peeler* Doctrine is based, not just to better understand the doctrine itself, but as background to *Hillcrest Equities, Inc. v. Thornton*, No. 05-96-01280-CV, 1999 WL 621994 (Tex. App. Aug. 17, 1999) (hereinafter *Hillcrest Equities*) in which the Texas Court of Appeals declined to extend the doctrine to prohibit Peeler from suing the accountants who helped engineer the tax shelters underlying her conviction for violating 26 U.S.C. § 7206(2). I discuss *Hillcrest Equities* separately below.

*Facts underlying adoption of Peeler Doctrine*

Carol Peeler was an officer in an equities firm, Hillcrest Equities. Along with others in the firm she was "suspected of engineering illegal tax write-offs for wealthy investors." *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 495-96

(Tex. 1995) (hereinafter *Peeler II*). She came under federal criminal investigation by the IRS and hired a partner at the law firm of Hughes & Luce to represent her. *Id.* On the advice of her attorney,

> Carol Peeler pleaded guilty to a criminal offense and received a sentence pursuant to a plea agreement. *See Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995) (plurality op.). Shortly thereafter, Peeler was told by a journalist that the United States Attorney had made an offer to Peeler's attorney of absolute transactional immunity if Peeler would become a witness and testify against her colleagues. *See id.* The revelation by the journalist was the first Peeler had heard of any offer of absolute immunity because her attorney had not communicated any such offer to her. *See id.* at 496, 498. The prosecuting attorney, an assistant United States Attorney, testified that he made this offer to Peeler through her attorney, and an agent of the Internal Revenue Service testified that, during plea-bargain discussions, the prosecutors told Peeler's attorney that the offer of immunity previously made was no longer available. *See id.* at 496, n.1, 498. Peeler's attorney denied that the assistant United States Attorney ever spoke to him concerning immunity for Peeler. *See id.* at 500 (Hightower, J., concurring).

*Futch v. Baker Botts, LLP*, 435 S.W.3d 383, 389-90 (Tex. Ct. App. 2014).

Peeler sought reversal by the Texas Supreme Court. The Court affirmed *Peeler I*, but could only render a plurality opinion,[14] meaning the new

---

[14] Of the nine members of the Texas Supreme Court that affirmed the Texas Court of Appeals opinion, one did not participate, four were in the majority, and the remaining four wrote separately. One of those who wrote separately said the appellant law firm's conduct, "if true, is reprehensible and unconscionable." *Peeler II*, 909 S.W.2d at 500 (Hightower, J., concurring). He did not, however, weigh in on the adoption of the doctrine.

doctrine would apply only in the courts of Texas's Court of Appeals for the Fifth District.[15]  *Peeler II*, 909 S.W.2d 494 (Tex. 1995).  The dissenters decried "this absolutist position[.]"  *Id.* at 501 (Phillips, C.J., dissenting).  These dissenting Justices were the doctrine's first critics, but they were far from the last.  Starting with these dissenters, it is entirely accurate to say, "*Peeler* has been criticized since its inception."  Van Cleve, *supra*, at 930 (citing John G. Browning & Lindsey Rames, *Proof of Exoneration in Legal Malpractice Cases:  The Peeler Doctrine and Its Limits in Texas and Beyond*, 5 ST. MARY'S J. ON LEGAL MALPRACTICE & ETHICS 50, 56 (2014) (listing sources of criticism)).[16]

Subsequent Texas opinions summarized the rule emanating from this fact-pattern as quoted, *supra*, in *Ray*, 952 S.W.2d 224, that the criminally

---

[15] When the Texas Court of Appeals, Dallas, rendered *Peeler I*, the opinion became law *only* for one of fourteen appellate districts in Texas – the Fifth Appellate District. *See Hardy v. Matter*, 350 S.W.3d 329, 333 (Tex. Ct. App. 2011) ("opinions of other Texas appellate courts, however, are not binding on us"); *Hines v. State*, 144 S.W.3d 90, 97 (Tex. Ct. App. 2004) ("At the outset, we respectfully acknowledge that as a court of equal jurisdiction to that of the Texarkana court, we [the Fort Worth Court of Appeals] are not bound by [that court's decision].")  That is, there is no horizontal *stare decisis* between or among any of Texas's fourteen (14) separate intermediate appellate court districts.  *See* Andrew T. Solomon, *A Simple Prescription for Texas's Ailing Court System:  Stronger Stare Decisis*, 37 ST. MARY'S L.J. 417, 429-30, 441 (2006).

[16] *See* Van Cleve, *supra*, at 928-29 ("Today, application of the doctrine frequently undermines public policy objectives and makes it harder for plaintiffs with legitimate claims to succeed in court."); Kevin Bennardo, *A Defense Bar:  The "Proof of Innocence" Requirement in Criminal Malpractice Claims*, 5 OHIO ST. J. CRIM. L. 341 (2007) ("civil plaintiff must prove her innocence of criminal wrongdoing in order to recover in a legal malpractice suit against her former criminal defense attorney. The reasoning behind such requirements is faulty"); Joseph H. King, Jr., *Outlaws and Outlier Doctrines:  The Serious Misconduct Bar in Tort Law*, 43 WM. & MARY L. REV. 1011, 1043-44 (2002) ("A stale smorgasbord of rationales has been offered to explain the serious misconduct bar.").

convicted defendant-cum-civil-plaintiff must accept his own criminal conduct as the sole proximate cause of his damages. *See, e.g.*, *Gonyea v. Scott*, 541 S.W.3d 238, 244 (Tex. Ct. App. 2017). The Exoneration Rule thus prohibits members of that category of civil plaintiffs from averring his defense counsel's comparative fault, thereby making it impossible to prove he committed any tort at all. Effectively, the rule narrowly revives contributory negligence.

I add no criticism of my own to the decision or analysis in *Lawrence v. Bingham*. It was the type of difficult policy decision necessarily made a part of our common law by the Supreme Court when the legislature fails to provide a legal solution. I cite these other critical authorities to illustrate the struggle every court experiences in striking "the proper balance between protecting the strong public policies of preventing convicts from escaping the consequences of, or benefiting financially from, their illegal acts and holding defense attorneys responsible for their professional negligence[.]" *Peeler II,* 909 S.W.2d at 500.[17]

---

[17] One scholar notes that "[t]he four public policies that *Peeler*'s plurality considered persuasive are only a few among the many raised by courts and scholars addressing criminal legal malpractice claims[.]" Van Cleve, *supra*, at 945. He went on to list others weighed on both sides of the balance.

- ensuring Sixth Amendment protections for criminal defendants by maintaining representation standards;
- seeking equitable representation for all – including alleged lawbreakers;
- treating attorneys equally instead of providing special protections to criminal attorneys;
- denying criminals the opportunity to profit financially from their crimes;
- preventing criminals from shifting responsibility for their crimes to third parties;
- maintaining severe consequences for criminal activity;

But the inescapable fact in all the *Peeler* Doctrine/Exoneration Rule jurisprudence is that it is narrowly focused to bar only civil actions for criminal malpractice against the attorney who defended him or her at trial.  Expanding it to bar claims against accounting firms is beyond anything the jurisprudence suggests. That brings me to the next relevant insight about the *Peeler* Doctrine.

When squarely presented with the opportunity to apply its version of the Exoneration Rule to prohibit the claims by Peeler's firm, Hillcrest Equities, against its accounting firm as a joint tortfeasor, the Texas court declined to do so. *Texas declined to apply Peeler Doctrine to bar claims against accountants*

We rendered *Ray v. Stone* in 1997 before critical examination of the *Peeler* Doctrine shone fuller light on its perils.  We could not have known then that, two years later, in a case tangential to *Peeler I* and involving some of its

---

- advancing the war on crime;
- protecting the credibility of the justice system;
- holding criminal defense attorneys responsible for their negligence;
- protecting future plaintiffs from bad lawyers;
- providing attorneys the freedom to do what is best for their clients instead of incentivizing the satisfaction of every client request;
- avoiding an influx of criminal legal malpractice cases that might overburden courts;
- avoiding circumstances that might discourage criminal defense attorneys from accepting new clients; and
- avoiding redundancy in a system already safeguarded by protections against mistaken convictions.

*Id.* at 945-46 (footnotes omitted).  This abundance of policy considerations simply goes to show the complexity of the issue faced by a jurisdiction's judiciary that must decide.

principals, the same Texas Court of Appeals in Dallas, and some of the same

Justices[18] who decided *Peeler I*, also decided *Hillcrest Equities*, *supra*.

Hillcrest Equities was the firm where Carol Peeler worked. She and

her partners were not alone in engineering tax write-offs for wealthy investors.

*Peeler II*, 909 S.W.2d at 496. They worked with an accountant, Grant Thornton,

and Thornton's firm. *Hillcrest Equities*, 1999 WL 621994, at *1. When Hillcrest

Equities sued Thornton for, among other things, contribution and indemnity,

Thornton claimed the *Peeler* Doctrine (the Texas Exoneration Rule) barred all the

claims. The trial court applied the doctrine and granted summary judgment to

Thornton. *Id.*, at *2. Hillcrest Equities appealed.

The Texas Court of Appeals acknowledged "[t]his lawsuit arises out

of Hillcrest's development and sale of a complex tax shelter program involving the

trade of government securities" violating federal tax laws and that Hillcrest

Equities' principals pleaded guilty to the charges. *Id.*, at *1, *2. The court

affirmed as to some claims after concluding they were "time barred." *Id.*, at *1.

However, the court "reverse[d] and remand[ed] to the trial court

Hillcrest's claims for contribution and indemnity against appellees Grant Thornton

---

[18] Texas refers to its Court of Appeals jurists as "Justice." The presiding justice in *Peeler I* was Hon. John D. Ovard; the associate justices were Hon. Joseph B. Morris and Hon. Linda Thomas. Justice Morris presided and authored the opinion in *Hillcrest Equities, Inc. v. Thornton*, No. 05-96-01280-CV, 1999 WL 621994 (Tex. Ct. App. Aug. 17, 1999). Justice Ovard was an associate justice in *Hillcrest*, and on this opinion, Ovard and Morris were joined by Hon. David L. Bridges.

and Alexander Grant & Company . . . ." *Id.*, at *1. The court expressly rejected the argument that the *Peeler* Doctrine prevented these claims and reversed the summary judgment. It was not a reversal based on genuine issues of material fact. "Thornton could not establish *as matter of law* that *Peeler* applied to bar Hillcrest's contribution and indemnity claims." *Id.*, at *8 (emphasis added).

The Texas court refused to expand the scope of the Exoneration Rule beyond criminal malpractice claims. We should demonstrate similar restraint. While imposing the "sole-proximate-cause" element of a tort upon this category of plaintiffs is justifiable vis-à-vis their former defense counsel, doing so is on far more tenuous ground in any other context. The reasons are obvious.

*Unique reasons for narrow application of Exoneration Rule*

The Exoneration Rule loses all force when applied outside claims for negligent criminal defense representation. Some policy considerations that weigh in favor of the Exoneration Rule to bar criminal malpractice claims simply do not affect claims against other professionals, like accountants. Those considerations include: precluding an influx of frivolous suits brought by every prisoner with time on his hands who was represented by a lawyer (effectively, all of them); avoiding circumstances that might discourage criminal defense attorneys from accepting new clients; and redundancy in a system already safeguarded by

protections against mistaken convictions such as found in RCr[19] 11.42 authorizing a claim that defense counsel was ineffective, and other post-conviction relief such as CR 60.02. *See* footnote 10, *supra*. These considerations – considerations not relevant to an action against a nonlawyer – impact the very justice system itself.

Kaisi's claim illustrates another distinguishing factor. The attorney who defended Kaisi was not engaged until after Kaisi was charged. He did not advise Kaisi to commit the crime.[20] By contrast, Kaisi engaged his accountants long before he committed his crimes, and committed them based on his accountants' advice, if his averments are taken as true. Again, the unclean hands doctrine is a much more comfortable fit to resolve this case.

A case-by-case inquiry as to proximate cause and cause-in-fact has always been the rule for tort claims. *Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016). The Exoneration Rule eliminates the need for such inquiry in criminal malpractice claims because, based on considerations unique to criminal defense attorneys, our Supreme Court made this specific public policy concession. The Exoneration Rule is meant to apply only in this narrow circumstance.

---

[19] Kentucky Rules of Criminal Procedure.

[20] I acknowledge the result might be different under different circumstances such as when a lawyer advises his client prior to his client's criminal activity and also serves as his defense counsel. That issue is not now, nor has it ever been before a Kentucky appellate court to my knowledge.

For these reasons, I concur in the result reached by the majority Opinion, but I cannot agree with its analysis.  I would affirm solely by applying the unclean hands doctrine.

BRIEFS FOR APPELLANT:

Scott A. Simon
Louisville, Kentucky

BRIEF FOR APPELLEES:

Richard L. Masters
Liam H. Michener
Louisville Kentucky